CRABTREE, J.T.C.
This is a local property tax case wherein plaintiff seeks review of judgments of the Essex County Board of Taxation affirming the 1985 assessments on plaintiff’s property located on the southeast corner of Ridge Road and Bradford Avenue in defendant municipality. The subject of this proceeding is 16 separately assessed condominium units acquired by plaintiff on or about March 22,1985. Of the 16 units so purchased, 14 were one-bedroom apartments assessed at $32,600 a unit, and two were two-bedroom apartments assessed at $37,900 a unit.
The issues are valuation and discrimination. More specific, the valuation issue involves the effect on market value of legislation affording extensive protection to elderly tenants; the discrimination issue deals with the sufficiency of the statutory remedy for discriminatory assessments in the face of plaintiff’s challenge to so-called spot or selective assessments in alleged violation of the uniformity clause of the New Jersey Constitution and the Equal Protection Clause of the 14th Amendment to the United States Constitution.
The 16 condominium units involved in this case are part of a 56-unit condominium complex known as Ridge Garden Condominiums, which was a 56-unit garden apartment prior to March 6, 1984. On that date a master deed dated February 10, 1984 was recorded in the Essex County Register’s Office. The execution and recording of the deed converted the complex to condominium ownership pursuant to N.J.S.A. 46:8B-8. Prior to October 1,1984, the assessing date for tax year 1985, the entire complex was assessed as a garden apartment; and the assessment for 1984 and some years prior was $970,000. As of October 1, 1984 defendant’s assessor assessed the 56 units as separate line items as required by N.J.S.A. 46:8B-19. The assessments, including the common elements, aggregated $1,868,000 for the 56 units. The aggregate assessments imposed upon the 16 units purchased by plaintiff amounted to $532,200.
*409 At the time of conversion to condominium ownership on March 6,1984[1], and at all other relevant times thereafter, all 16 units under review were occupied by elderly tenants qualified in terms of age and income limitation for protection under the Senior Citizens and Disabled Protected Tenancy Act, L.1981, c. 226, N.J.S.A. 2A:18-61.22 et seq. (hereafter, the tenants will be referred to as “seniors”).
Plaintiff purchased the 16 units in question as a package on March 22, 1985 for the aggregate sum of $570,000. The unit purchase price was $35,000 for the one-bedroom units and $40,000 for the two-bedroom units. These were the last units sold; the first 40 units were sold approximately two years prior.
In July or August 1986 plaintiff resold two of the 14 one-bedroom units. One of them was vacant and sold for $106,500; the other was still occupied by a senior and sold for $72,000.
Plaintiff was familiar with the property, having been the owner several years before conversion from rental apartments to condominiums. At the time he bought the 16 units he knew that all the tenants were seniors and that their tenancies were protected by the Senior Citizens and Disabled Protected Tenancy Act.
Condominium units occupied by seniors are often purchased in bulk in order to spread the risk of the extended occupancy permitted by law. Statistical data upon which plaintiff relied indicate that, each year, one unit out of 16 so occupied becomes vacant for one reason or another. There is no evidence in the record from which the court could conclude that plaintiff benefited from a price discount by reason of a single purchase of 16 units.
At all times pertinent hereto, a rent-control ordinance was in effect in defendant taxing district. That ordinance provided, inter alia, for a pass-through to the tenants of taxes in excess *410 of base year taxes. The base year specified in the ordinance is 1976.
Plaintiff contends that the price paid for the 16 condominium units is the best evidence of their value for property tax purposes. Accordingly, he submitted no expert valuation testimony.
Defendant, on the other hand, offered the testimony and appraisal of a distinguished, highly regarded valuation expert, who estimated the true value of the subject property on the assessing date at $58,000 each for the 14 one-bedroom units and $62,500 each for the two two-bedroom units. In reaching these conclusions he relied upon eight sales of condominium units in the Ridge Garden Condominiums. The sales, which were composed of an equal number of one-bedroom and two-bedroom units, occurred between February 1984 and June 1985, with six sales transacted in February and March 1984, one in September 1984 and one in June 1985. The prices ranged from $49,900 to $60,000 for the one-bedroom units. Two of the two-bedroom units sold for $59,900 each, while the other two, two-bedroom units, sold for $65,000 each. Only one of the eight comparables relied upon by the expert was occupied by a qualified senior on the date of sale. Of the remaining seven comparables, two were purchased by tenants protected by the Anti-Eviction Law. One of these, a one-bedroom unit, was sold to the insider tenant for $49,900, while the other, a two-bedroom unit, was sold to the insider tenant for $59,900. The sale prices of the other five units ranged from $52,500 to $60,000; the two, two-bedroom units included in those five units sold for $65,000 each.
Defendant’s expert assumed that all 16 units were occupied by seniors, but he did not ascertain whether any of the eight units he utilized as comparables was occupied by a senior. He attempted to demonstrate, through a discounted cash flow analysis, that the occupancy of the units by seniors had no effect on market value.
It is well settled that the selling price of real property involved in a property tax proceeding may be persuasive evi *411 dence of its market value for assessment purposes. Hackensack Water Co. v. Division of Tax Appeals, 2 N.J. 157, 65 A.2d 828 (1949); Niktan Realty Co. v. City of Passaic, 1 N.J.Tax 393 (1980). Plaintiff invokes this salutary principle in urging that the true value of the 16 units is reflected in the prices paid for them in March 1985, and that the occupancy of the units by seniors enjoying protected tenancies affected not only the prices paid but the market value as well.
Defendant argues that protected tenancy legislation has no effect on true value for property tax purposes, that such legislation merely creates a leasehold interest in the protected tenant similar to the interest of a tenant in possession of commercial property under a long-term below-market lease; and that property must be valued under the “bundle of rights” concept, i.e., the value is the sum of all the interests in the property.
 As a general proposition, all interests in land must be valued for tax purposes. In re Neptune Tp. Appeal, 86 N.J.Super. 492, 207 A.2d 330 (App.Div.1965); Tower West Apartment Ass’n v. West New York, 2 N.J.Tax 565 (Tax Ct.1981), aff’d o.b. per curiam 5 N.J.Tax 478 (App.Div.1982). More specific, property subject to a leasehold interest must be assessed at its full value not merely the interest of the lessor or lessee. Secaucus v. Damsil, Inc., 120 N.J.Super. 470, 295 A.2d 8 (App.Div.), certif. den. 62 N.J. 90 (1972); Merchandise Mart Associates v. Pennsauken Tp., 3 N.J.Tax 275 (Tax Ct.1981); Lawrence Associates v. Lawrence Tp., 5 N.J.Tax 481 (Tax Ct.1983). The leasehold interest concept has also been applied by this court to tenants’ rights created by statute, with the result that the property involved was valued without regard to the tenancies. Briskin v. Atlantic City, 6 N.J.Tax 187 (Tax Ct.1983); Presidential Towers v. Passaic, 6 N.J.Tax 406 (Tax Ct.1984), aff’d per curiam 7 N.J.Tax 655 (App.Div.1985).
Those cases, however, dealt with the effect upon value of tenants’ rights under the Anti-Eviction Law. N.J.S.A. 2A:18-61.1 et seq. They did not involve the Senior Citizens and *412 Disabled Protected Tenancy Act (hereafter the protected tenancy act), which imposes restrictions upon an individual’s property rights which are far more severe than those imposed by the Anti-Eviction Law. Under the latter statute a tenant may be evicted fk years after conversion to a condominium or cooperative, provided the landlord waives payments of six months’ rent. N.J.S.A. 2A:18-61.10, -61.11. The protected tenancy act permits occupancy by a qualified senior for as long as 40 years after conversion. N.J.S.A. 2A:18-61.24(h).
Also, Briskin and Presidential Towers dealt with the purchase of condominiums by former tenants, who were given preferential prices or terms by reason of their prior status as tenants protected by the Anti-Eviction Law. Thus, in those cases, the interest of lessor and lessee merged upon purchase of the condominium units by the former lessees. In the instant case, on the other hand, the court deals with condominium units still occupied by seniors protected in their tenancies by the protected tenancy act.
Notwithstanding the foregoing distinctions, however, I now disagree with the concept applied in those earlier cases, namely, that legislation creating an interest in the tenants was the same as the leasehold interest created by private contract. As the following analysis makes it clear, the distinction between legislative fiat and private contract is significant.
It is, of.course, well settled that governmental restrictions may affect the value of real property for property tax purposes. Zoning regulations affect value, State v. Gorga, 26 N.J. 113, 138 A.2d 833 (1958); State v. Wildlife Preserves, 134 N.J.Super. 287, 340 A.2d 665 (App.Div.1975); Sage v. Bernards Tp., 5 N.J.Tax 52 (Tax Ct.1982); so do pinelands development controls, Riorano v. Weymouth Tp., 4 N.J.Tax 550 (Tax Ct. 1982), aff’d o.b. per curiam 6 N.J.Tax 253 (App.Div.1983); sewage disposal requirements, West Orange v. Goldman’s Estate, 2 N.J.Tax 582 (Tax Ct.1981), and flood zone regulations, Halocarbon Products v. South River Boro., 1 N.J.Tax 294 (Tax *413 Ct.1980), aff’d and remanded 181 N.J.Super. 1, 436 A.2d 532 (App.Div.1981).
Defendant argues that the restrictions imposed by the protected tenancy act have little or nothing to do with the value of the 16 subject units, that the prices paid by plaintiff do not reflect value but rather the consummation of a shrewd bargain by a canny, knowledgeable investor. In support of this position defendant contends: (1) the selling price of the eight comparable units sold in Ridge Garden Condominiums in 1984 and 1985 (seven of which preceded the assessing date of October 1, 1984) were substantially higher than the prices paid by plaintiff for the 16 subject units and (2) that the simultaneous purchase of 16 units necessarily resulted in a discounted price.
Both contentions are unsound. No conclusion with respect to the effect on market value of senior occupancy can be drawn from the eight comparable sales, as the proofs reveal that seven of the comparable properties were not occupied by seniors at the time of sale. As for the inference of discount to be drawn from a purchase in bulk of 16 units, the inference can also be drawn that, given the occupancy of all the subject units by statutorily protected long-term tenants, the bulk purchase served to spread the risk, i.e., it enhanced the probability that one or more of the units would be vacated each year. Statistics, of which plaintiff was cognizant, show that one out of every 16 senior-occupied condominium or cooperative units becomes vacant each year. Had plaintiff purchased only one or two units the risk of long-term occupancy would have been much greater, with a corresponding reduction in the price he would be willing to pay. At the very least, the price would have remained the same; it would not have been higher.
To appreciate the risk of protected senior tenancies and to understand why, like zoning and other governmental restraints upon the rights associated with real property ownership, such tenancies have an impact upon market value, it behooves the court to examine in detail the protected tenancy act and the judicial decisions construing it. Another purpose of the de *414 tailed examination of the statute is to show that the determination of value should not include the protected tenant’s leasehold interest, i.e., that the interest is not the equivalent of a long-term lease created by private contract.
Upon conversion of an apartment to condominium or cooperative ownership a senior citizen tenant, i.e., one who is at least 62 years of age and whose annual income, taxable and nontaxable, does not exceed three times the county per capita personal income (as last reported by the Department of Labor and Industry) may, upon proper application to the Department of Community Affairs, continue to occupy the converted unit for up to 40 years following conversion.[2] N.J.S.A. 2A:18-61.24, -61.25 and -61.28. Where, as in Cedar Grove, a rent-control ordinance is in effect, the senior’s rent may not be increased except as permitted by the ordinance; and increased costs attributable to conversion may not form the basis for a rent increase. N.J.S.A. 2A:18-61.31; G.D. Management Co. v. Negri, 182 N.J.Super. 409, 442 A.2d 611 (App.Div.1982). It has been held that a tax increase resulting from an assessment increase attributable to conversion is a conversion cost within the meaning of the statute and, thus, may not be passed on to the tenant, even though the applicable rent control ordinance permits a tax increase pass-through. Litt v. Rutherford Rent Bd., 196 N.J.Super. 456, 483 A.2d 239 (Law Div.1984); B.H. Associates v. Brudner, 185 N.J.Super. 403, 449 A.2d 23 (Cty. D.Ct.1982). In Brudner the taxes were increased 270% immediately after conversion, while, in Litt, taxes were increased upon conversion to a cooperative from $122,289 in 1982 to $292,590 in 1983. In the instant case the assessment for the entire condominium complex was increased from $970,000 in 1984, when the complex was a garden apartment, to $1,868,000 in 1985, almost double the prior year’s assessment. Assuming *415 the same tax rate for both years[3], taxes were increased from $37,248 to $71,731 an increment of $34,483 or $615 a unit. For the 16 units purchased by plaintiff the aggregate tax increase was $9,840, no part of which could be passed on to plaintiffs tenants even though Cedar Grove’s rent-control ordinance permitted a pass-through of tax increases over a base year.
To sum up, the protected tenant may not be evicted for 40 years (assuming continuing income qualification); the unit remains subject to the local rent-control ordinance and rent increases are limited by that ordinance; no part of the costs of conversion to condominium ownership may be passed on to the tenant; tax increases attributable to an increased assessment are considered conversion costs and thus may not be passed on to the tenant, even though the rent control ordinance allows tax pass-throughs.
In dealing with similar, but less stringent, restraints imposed by the Anti-Eviction Law upon a property owner’s rights following conversion to cooperative ownership Judge Evers of this court concluded that the Anti-Eviction Law was no different from any other governmental restriction and that the statute must be taken into account in determining true value for tax purposes. Berkley Arms Apartment Corp. v. Hackensack, 6 N.J.Tax 260 (Tax Ct.1983). In that case the court observed:
It may also be argued that such government imposed restrictions simply create an encumbrance or cloud on the form of legal ownership and thus do not impact on the value of the total interests as opposed to, for instance, the effects of N.J.S.A. 13:9A-1 et seq. (Wetlands Act) and N.J.S.A. 13:19-1 et seq. (Coastal Area Facilities Eeview Act), or local zoning ordinances all of which control the use to which property may be devoted and thus impact on its total value. However, I do not view the imposition of these government regulations as having a lesser impact on value than would zoning restrictions. In the latter case, in the proper circumstances, a taxpayer may obtain relief. In the former, except through seeking a reduction in taxes, there is no recourse as the *416 taxpayer cannot pass through (to the protected tenants) tax increases resulting from the conversion; and cannot even rely on these circumstances as support for a hardship rent increase in spite of the fact that the rental income does not offset the owner’s overall costs in purchasing and carrying the converted apartment. Such restrictions are far removed from the problem which may be visited upon the lessor in an improvident, but voluntary, lease situation____[at 293]
If the protected tenancy act advances the salutary goal of protecting from eviction those elderly tenants who lack the financial resources to relocate—and our Supreme Court has held that it does, Edgewater Inv. Associates v. Edgewater Boro., 103 N.J. 227, 510 A.2d 1178 (1986)—the question remains: who pays for it? The statute and case law indicate that no part of the tax increase attributable to condominium or cooperative conversion may be passed on to the protected tenant. The choice is then among the owner-investor, the local municipality and the taxpayers of the State. Fundamental fairness dictates that the owner should not bear the burden. The case is no different from takings under the 5th and 14th Amendments to the United States Constitution. The requirement that government pay just compensation for taking private property “is designed to bar government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.” First English Evangelical Lutheran Church of Glendale v. County of Los Angeles, California, — U.S. -, -, 107 S.Ct. 2378, 2388, 96 L.Ed.2d 250 (1987). Accord Armstrong v. United States, 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960). This narrows the choice to the local municipality and the State taxpayers. The latter should bear the burden, as it was imposed by the State Legislature. The Legislature, however, has made no provision for that which simple justice requires. Accordingly, the local municipality must shoulder the public load.
This leads to the conclusion that the 16 subject units must be valued at the price paid by plaintiff and assessed accordingly, with the assessment otherwise attributable to the value of each *417 tenant’s interest spread among the remaining properties in the taxing district.
I conclude from the foregoing that the true value of each of the one-bedroom units purchased by plaintiff is $35,000 and the true value of each of the two-bedroom units is $40,000.
The average ratio as promulgated by the Director, Division of Taxation for Cedar Grove for tax year 1985 was 56.88%. The upper limit of the common level range was 65.41%. The one-bedroom units were assessed at $32,600 each and the two-bedroom units were assessed at $37,900 each. The ratio of assessed to true value is thus 93.14% for the one-bedroom units and 94.75% for the two-bedroom units. As these ratios exceed the upper limit of the common level range plaintiff is entitled to relief pursuant to N.J.S.A. 54:51A-6 by application of the average ratio to the true value as herein found. As the statutory remedy[4] for discrimination relief is appropriate, the assessments will be $19,900 (rounded) for each of the one-bedroom units and $22,000 (rounded) for each of the two-bedroom units.
Plaintiff alleges that the 1985 assessment of the 56 units as separate line items pursuant to N.J.S.A. 46:8B-19 constitutes a selective or spot assessment in violation of the uniformity provisions of the New Jersey Constitution and the Eqüal Protection Clause of the 14th Amendment to the United States Constitution. The property was converted from rental apartments to condominiums in 1984. Theretofore, the property was assessed as an apartment complex. Plaintiff contends that the assessment as separate condominium units, even though made in accordance with statute, was an arbitrary singling out of the garden apartment complex and that the assessment thereon could not be increased without reassessing all the properties in the taxing district. Plaintiff reasons from this argument that relief from the alleged spot assessment can be accomplished *418 simply by restoring the 1984 assessment and fragmenting it into 56 units in order to comply with N.J.S.A. 46:8B-19 which mandates a separate assessment for each condominium unit.
The New Jersey Supreme Court has held that c. 123 is the exclusive remedy for assessment discrimination except for extreme, severe or egregious circumstances or unless the application of c. 123 still leaves the taxpayer with a confiscatory assessment. Murnick v. Asbury Park, 95 N.J. 452, 471 A.2d 1196 (1984) (citing with approval 525 Realty Holding Co. v. Hasbrouck Heights, 3 N.J.Tax 206 (Tax Ct.1981)) and Jefferson House Investment Co. v. Chatham, 4 N.J.Tax 669 (Tax Ct. 1982). If it were permissible to restore the 1984 assessment[5] and divide it by the number of condominium units the average assessment per unit (without distinction between one- and two-bedroom units) would be $17,320. The difference between the latter amount and the assessment hereinabove determined in accordance with c. 123 is, if not insignificant, than certainly not confiscatory, nor does it demonstrate the presence of extreme, severe or egregious circumstances.
Plaintiff acknowledges the Murnick principles but claims that they are confined to requests for relief from disparate treatment discrimination; whereas spot assessments are different. While the distinction attempted by plaintiff is not persuasive, it serves to point up the wisdom of treating all discrimination claims alike, whatever their origin. Thus, if c. 123 provides relief, the only test remaining to be satisfied is the sufficiency of that relief in terms of the Murnick standard; and it matters not whether the source of the discrimination was disparate treatment (i.e., assessment at a higher ratio than other properties) or an alleged arbitrary singling out of a property for spot or selective assessment.
Judgment will be entered determining the assessment for the 16 units involved to be as follows:
*419 1-bedroom units 2-bedroom units
Land $ 8,800 $ 6,000
Improvements 11,100 16,800
Total $19,900 $22,800

The conversion is effective upon recording the master deed in the office of the county recording office. N.J.S.A. 46:8B-8.

The occupancy may continue only so long as the tenant meets the income limitation. N.J.S.A. 2A:18-61.32.

The tax rate in Cedar Grove increased from $3.84 in 1984 to $4.16 in 1985; a tax increase is thus partially attributable to the rate increase and not to condominium conversion. Calculation of the increase attributable to the increased assessment requires application of the 1984 tax rate.

N.J.S.A. 54:51A-6 is that part of c. 123 applicable to proceedings in this court.

Restoration of the pre-conversion assessment is not permitted. Cigolini Associates v. Fairview Boro., 208 N.J.Super. 654, 506 A.2d 811 (App.Div.1986).